[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
RULING RE: PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (File #109)
The amended complaint alleges that USM Corporation (USM) was, at all relevant times, the wholly owned and controlled subsidiary of Emhart Corporation (Emhart). According to the documentation, USM owned and operated a facility on Main Street, Ansonia, referred to as its Farrel Division, which facility consisted of real property along the Naugatuck River, and several operations including a roll shop, foundry, machine shop, storage buildings, etc. On January 29, 1986, SHW and USM entered in an Agreement under which SHW agreed to purchase, and USM agreed to sell, the land, premises, and business assets comprising the Roll Products Division of USM's Farrel Division; the Roll Products Division consisted of the roll shop and the foundry which, after the transfer, retained the address of 28 Main Street. The remainder of USM's Farrel Division (the machine shop, engineering building, process laboratory, and storage building) were transferred to the entirely separate, newly formed Farrel Corporation.
The complaint alleges that Emhart/USM knew, or should have known, that the Farrel Division operations had in the past generated more than 100 kilograms of hazardous waste per month. SHW alleges that Emhart/USM did not file a negative declaration, pursuant to General Statutes Section 22a-134, et seq., in connection with the sale and transfer of the Roll Product Division. Section 35 of the Agreement provided that within sixty days after closing the purchaser (SHW) would have prepared an independent study and survey describing the measures necessary to bring the premises into material compliance with all federal, state, and local environmental laws; and, that upon completion of the study, the seller (Emhart/USM) would have the option of it) causing the work to be done to bring the premises into compliance, or (ii) refunding the settlement payment, or part thereof, in return for a conveyance back of the premises, or that portion thereof, on which existed material non-compliance, which could reasonably separated from the remainder of the premises. It is undisputed, and the documentation before the court substantiates, that prior to 1984, CT Page 1843 the entire Farrel Division facility had a single EPA identification number issued by the Environmental Protection Agency identifying the facility location as a hazardous waste generator, and issued to track waste shipped off the site.
The complaint, as amended, is in six counts. The first count alleges that Emhart breached the sales contract and indemnity agreement because it sold the Ansonia property knowing it was contaminated by heavy metals, polychlorinated bipheryls, and other pollutants. The second count, which is the subject of the instant motion, alleges that defendant is strictly liable to plaintiff under the Connecticut Transfer of Establishments Acts, General Statutes Section 22a-134, et seq. The third and fourth counts allege, respectively, negligent and intentional (fraudulent) misrepresentation in that the property sold was represented to be in compliance with environmental laws and health safety regulations. In the fifth count, plaintiff alleges that defendant is responsibly under General Statutes Section 22a-452 for reimbursement of all costs expended by SHW to remove, contain, or otherwise mitigate the effects of the contamination; and, the sixth count alleges violations of the Connecticut Unfair Trade Practices Act, General Statutes Section 42-11ob, et seq.
Plaintiff has filed a motion for summary judgment on the second count of its amended complaint. Under Prac. Bk. Section 37 et seq., any party may move for summary judgment when the pleading are closed, and judgment shall be rendered if the pleadings, affidavits, and supporting documentation establish that there exists no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. cf. Daily v. New Britain Machine Co., 200 Conn. 562, 568-69 (1986). Summary judgment is a legal means for the disposal of cases in a more expeditious, less costly fashion. Yanow v. Teal Industries, Inc., 178 Conn. 262,269 (1979). On summary judgment, the court's proper function is to apply the rules of practice and determine "whether an issue of fact exists, but not to try that issue if it does exist." Nolan v. Borkowski, 206 Conn. 495, 500 (1986); Michaud v. Gurney, 168 Conn. 431, 433 (1975). Affidavits, documents, and the pleadings are to be considered in determining whether there exists a genuine issue of fact. Bartha v. Waterbury House Wrecking Co., 190 Conn. 8, 12 (1983). Prac. Bk. Section 380 requires that an adverse party file opposing affidavits and available documentary evidence prior to the time the summary judgment motion is set down on the short calendar. Mere assertions of fact, whether contained in a pleading or a brief, are insufficient to establish issues of fact, and will not serve to refute evidence properly presented to the court in accordance with the Practice Book provisions. 190 Conn., supra at p. 11-12. "Once the moving party has presented evidence in support of a summary judgment motion, the opposing party must present evidence that demonstrate CT Page 1844 the existence of some disputed issue." State v. Goggin, 208 Conn. 606,616 (1988). In short, the summary judgment motion is designed and intended to dispose of actions in which there is no issue of any material fact. Michaud v. Gurney, supra at p. 433.
Accordingly, a party moving for summary judgment must demonstrate that it is quite clear what the truth is, and that there does not exist any real doubt regarding the existence of any genuine issue of material fact. State v. Goggin, supra. Since the party moving for summary judgment has the burden of proof in showing the absence of material issues of fact, and that he is entitled to judgment as a matter of law, the facts must be viewed in the light most favorable to the party opposing the motion. Id. at p. 615-16. The test is whether the moving party would be entitled to a directed verdict on the same facts as a matter of law. Nolan v. Barkowski, supra at p. 505. Apropos of the instant case, the summary judgment procedure is generally "ill adapted" to cases of a "complex nature", involving issues worthy of full exploration at trial. United Oil Co. v. Urban Redevelopment Commission, 158 Conn. 364, 375 (1969). And, in matters presenting mixed questions of law and fact, summary judgment is normally inappropriate. Fogarty v. Rashaw, 193 Conn. 442, 446 (1984).
The pleadings are closed as between the parties. In support of the present motion, plaintiff has filed memoranda of law the affidavit, and portions of a deposition, of Leonard Antinozzi, the former safety coordinator of USM the affidavit of Paul Franson, Hazardous Materials Management Unit, Connecticut DEP, concerning information in the DEP files on hazardous waste manifests covering off-site shipments during 1984 and 1985; copies of hazardous wastes manifests of USM during those years; the affidavits of Hayden S. Solomon, president of Hydro-Environmental Technologies, Inc. (HETI), with attached environmental report prepared by HETI pursuant to Section 35 of the Sales Agreement; the affidavit of Peter Y. Solmssen, attorney for, and Secretary of, SHW stating that defendant never furnished a negative declaration with respect to the transfer, and detailing expenses incurred, and to be incurred, by plaintiff in regard to the alleged contamination, and the remediation thereof; the affidavit of Betsy Wingfield, Hazardous Materials Management Unit, Connecticut DEP, indicating that the DEP records reflect no negative declaration having been filed with respect to the transfer of the subject premises; a copy of the Connecticut General Assembly Senate Proceedings setting forth an explanation of the terms and purpose of the Transfer of Establishments legislation on the Senate floor, and, copies of DEP's forms prepared and promulgated for implementation of the Transfer of Establishments Act.
Defendant has filed opposing memoranda of law; the affidavit of William C. Monroe, attorney for the defendant who negotiated the CT Page 1845 sale, setting forth certain specifics regarding the division of the entire facility, explaining Section 35 of the Agreement, and stating that the "hazardous waste storage area" located "below the railroad tracks" was not included in the premises conveyed to SHW; the affidavit of John B. Blatz, attorney for the defendant, stating that he was advised by a DEP attorney that the 100 kilogram per month limit applied only to the specific operations being transferred and that, therefore, the transfer of the roll shop and foundry operations would not be subject to the Transfer Act if those operations had not generated hazardous waste in quantities greater than 100 kilograms per month, or were not used for waste handling activities relating to other portions of the property which did generate in excess of 100 kilograms per month; the affidavit of Raymond Hawes, defendant's former corporate manager of manufacturing services, and later a consultant to defendant, stating that the bulk of the hazardous waste generated at the Ansonia facility was generated by the machine shop, that there was a "hazardous waste storage area" at the Ansonia facility for all hazardous waste generated by the various operations, and that the shipment dates taken from the hazardous waste manifests give no indication of the period of time over which specific amounts of hazardous waste were generated, or the specific points of generation within the Ansonia facility; the affidavit of George S. Goodridge, Group Counsel to defendant's Farrel Machinery Group from 1977 to 1989 (involved with the environmental aspects of the Ansonia facility, including compliance with applicable environment. laws) stating that the roll shop and foundry operations transferred to SHW generated "a very small amount of hazardous waste", that the foundry generated "virtually no hazardous waste", and that the hazardous waste storage area below the railroad tracks was not conveyed to plaintiff; the affidavit of Richard D. Somoya, former safety manager for the Farrel Division of USM, and the person under whose supervision plaintiff's affiant, Mr. Antinozzi, performed his environmental duties, stating that the EPA hazardous waste number was regularly assigned to "waste oil and water combustible liquid" without performing flashpoint testing to determine the actual characteristic of ignitability, that this was done"out of an abundance of caution" in order to ensure compliance with recently enacted and complicated hazardous waste transportation and disposal regulations, and that flashpoint testing on every barrel would be necessary in order to determine actual ignitability characteristics and whether the waste actually constituted hazardous is material a copy of a portion of the Antinozzi deposition confirming that the waste manifests cover the whole facility, not just the roll shop operations; and, a surveyor's map of the entire Ansonia property.
General Statutes Section 22a-134 (1) defines "Transfer of Establishment" as "the transfer of any operations which involve the generation, . . . reuse, transportation, treatment, storage, CT Page 1846 handling or disposal of hazardous waste, or any other transaction or proceeding through which an establishment undergoes a change in ownership, including, but not limited to, sale of stock in the form of a statutory merger or consolidation, sale of the controlling share of the assets, the conveyance of real property, change of corporate identity or financial reorganization. . . ." Subsection (3) of the statute defines "Establishment" as "any establishment which on or after May 1, 1967, generated more than one hundred kilograms of hazardous waste per month. . . ." Subsection (5) defines "Negative declaration" as "a written declaration on a form prescribed by the commissioner stating (1) that there has been no discharge, spillage, uncontrolled loss, seepage or filtration of hazardous waste on site, or that any such discharge, spillage, uncontrolled loss, seepage or filtration has been cleaned up in accordance with procedures approved by the commissioner or determined by him to pose no threat to human or safety or the environment which would warrant containment and removal or other mitigation measures and (2) that any hazardous waste which remains on site is being managed in accordance with this chapter . . . and regulations adopted thereunder."
Section 22a-134a(b) provides that "[p]rior to transferring an establishment, the owner or operator shall submit a negative declaration to the transferee and shall, within fifteen days after the transfer, submit a copy of such declaration to [DEP]". Section22a-134b, entitled "Damages", reads: "Failure of the transferor to comply . . . entitles the transferee to recover damages from the transferor, and renders the transferor of the establishment strictly liable, without regard to fault, for all cleanup and removal costs and for all direct and indirect damages."
Plaintiff maintains that defendant is strictly liable under the Connecticut Transfer Act for all cleanup costs and damages because the defendant failed to provide a negative declaration regarding the presence of hazardous waste on the Ansonia property prior to the asset sale of the Rolls Division. Plaintiff argues that the documentation submitted establishes that (1) the subject property was an establishment, as statutorily defined; (2) an establishment was transferred; (3) no declaration regarding the presence of hazardous waste was provided by the transferor; and (4) there exists an unremediated hazardous waste discharge at the establishment rendering the transferor strictly liable for all cleanup costs related to said contamination. With regard to element (l) above ("establishment"), the requirement is proof of the generation of more than 100 kilograms of hazardous waste per month.
Plaintiff contends that the affidavits of Leonard Antinozzi and Paul Framson, together with the copies of the 1984 and 1985 shipping manifests, establish that defendant generated an average of 128.89 kilograms of hazardous waste per month in 1984, and CT Page 1847 671.98 kilograms per month in 1985, thereby bringing defendant with the statutory definition of an "establishment." The Antinozzi affidavit recites that the affiant was Safety Assistant and Safety Coordinator of USM Corporation (Farrel Division) for the years 1979 through 1986, and that in such capacity, he "was familiar with the hazardous waste management practices followed by USM at the Farrel Facility." The Antinozzi affidavit further states: (1) in the course of its operation of the Farrel Facility. USM used a number of hazardous substances and generated various hazardous wastes including waste solvents such as perchloroethylene and 1.1.1 trichloroethane, and waste oils containing PCB's; (2) hazardous waste generated at the Farrel Facility was collected from different parts thereof by USM personnel and held at a single location for pick-up for transportation to an off-site disposal facility; (3) all hazardous waste generated by USM at the Farrel Facility which was transported off-site for disposal between February 21, 1984 and October 30, 1985 was accompanied by a manifest bearing USM's EPA hazardous waste generator identification number; (4) review of copies of hazardous waste manifests under that identification number for the years 1984 and 1985 indicates that USM generated at the Farrel Facility the following amounts of hazardous waste which was shipped off-site: 1984, total of 1,534.68 kilograms, or a monthly average of 127.89 kilograms; 1985 total of 8063.71 kilograms, or a monthly average of 671.98 kilograms. The affidavit of Paul Franson, an Environmental Analyst in the Hazardous Materials Management Unit, Connecticut DEP, who located the DEP records under USM's EPA Identification Number, and the copies of the shipping manifests themselves, confirm the essential data set forth in the Antinozzi affidavit, that is, the monthly kilogram average in 1984 and 1985 for the entire facility. From the aforesaid facts, plaintiff asserts that because their Solmssen and Wingfield affidavits establish that defendant did not provide the statutory declaration, Emhart is strictly liable for clean-up costs, containment expenditures, etc.
It is defendant's position that the roll shop and foundry operation itself, which is what was actually transferred to plaintiff, did not constitute an "establishment" within the purview of the Transfer Act. The affidavit of William C. Monroe, submitted by defendant, states that he served as Group Counsel, and a member of the law department of USM Corporation, and recites: (1) in anticipation of a proposed sale of the Ansonia facility to separate buyers, USM began the division of the facility into two separate and independent facilities, one consisting of the roll shop and the foundry, sold under the July 29, 1986 Agreement, and the other consisting primarily of the machine shop, engineering building, process lab, and offices and storage building, which was sold to a newly formed Farrel Corporation under a separate Purchase and Sale Agreement dated February 18, 1986, and, (2) Section 35 of the January 29, 1986 Sale Agreement, covering the CT Page 1848 roll shop and foundry sale, provided for the independent environmental study, with defendant agreeing to defray the costs of compliance, or accept a reconveyance. Defendant argues that the Hazardous waste generation figures set forth in plaintiff's "Antinozzi affidavit" (and in the shipping manifests) cover the entire property prior to its documented subdivision in anticipation of separate sales), and not specifically to the amounts of waste generated by the foundry and roll shop operation. In such regard, defendant emphasizes that its Blatz affidavit establishes that DEP advised defendant that the 100 kilogram limit would apply only to the specific operations being transferred, provided those operations had not generated hazardous waste quantities greater than 100 kilograms per month and were not used for waste handling activities relating to other portions of the property generating in excess of the 100 kilogram limit. The Goodridge and Hawes affidavits establish that the roll shop and foundry operations generated only a small percentage of the hazardous waste stored at the Ansonia location.[1]
Clearly the Antinozzi affidavit, the Franson affidavit, and the hazardous waste manifests copies refer to the 1984/85 hazardous waste generated at the entire Ansonia property, and do not specify the amount of waste generated just by the roll shop and foundry operations which were the subject of the transfer under the 1/19/86 Sale Agreement. In the court's view, that circumstance, in the face of the documentation submitted by defendant (and, moreover, considering the opinion of DEP regarding the application of its own Act), gives rise to a genuine issue of material fact. The supporting documents submitted by plaintiff do not establish that the property actually transferred generated more than 100 kilograms of hazardous waste per month; that is, that the particular property transferred to SHW (roll shop and foundry) constituted an establishment within the statutory definition of Section 22a-134 (3).
Additionally, defendant has furnished the Somoya affidavit stating that the Farrel Division regularly assigned the EPA number to waste without performing flashpoint testing out of an abundance of caution to ensure compliance with complicated and intricate environmental laws. Plaintiff, in response thereto, argues that defendant, once having decided to list the waste substances under the EPA number shown on the shipping manifests, is now precluded from controverting the waste quantities shown in the manifests and previously reported to DEP. However, in the court's view, the Somoya affidavit raises a factual issue regarding the accuracy or reliability of the content of the crucial shipping manifests and, regardless of plaintiff's understandable position that defendant is now simply impeaching its prior representations to DEP, the content of the Somoya affidavit should be before the trier of fact to be afforded whatever weight, if any, is determine to be appropriate with respect to hazardous waste quantities CT Page 1849 generated during 1984 and 1985.[2]
Factual issues remain which must be resolved through the presentation of evidence to a trier of fact. The resolution of the ultimate issue under count two will also involve an interpretation of the Connecticut Transfer Act provisions which will have important and significant public ramifications in relation to the protection of the environment. In my view, resolution of the factual issues and an interpretation of this statute should be rendered only upon a thorough presentation of the relevant evidence, and a careful assessment thereof by a trier of fact.
Plaintiff's motion for partial summary judgment is denied.
Mulcahy, J.
Footnotes